

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-13-00072-CV

Edwin **NOLAN** and Joel Loehman,
Appellants

v.

William Henry **HUNTER**, Jr. and Rhonda Hunter,
Appellees

From the 433rd District Court, Comal County, Texas
Trial Court No. C2011-715D
Honorable Dib Waldrup, Judge Presiding

Opinion by:　Karen Angelini, Justice

Sitting:　　　Catherine Stone, Chief Justice
　　　　　　Karen Angelini, Justice
　　　　　　Rebeca C. Martinez, Justice

Delivered and Filed:　September 25, 2013

AFFIRMED

This appeal arises from a dispute over the enforcement of restrictive covenants. The appellees, Bill and Rhonda Hunter, bought a lot in the Emerald Valley Subdivision in Comal County, Texas in February 2011. Shortly thereafter, the Hunters built a fence on their lot. The appellants, Edwin Nolan and Joel Loehman, claimed the Hunters' fence violated the subdivision's restrictive covenants, which required fences to be approved by an architectural control committee and to be located at least fifty feet from the roadway. Nolan and Loehman are members of the

subdivision's architectural control committee, referred to as "the ACC." Nolan also owns property in the subdivision.

The Hunters sued the ACC, Nolan, and Loehman, seeking a declaration that the ACC was no longer viable. The Hunters also sought a declaration that, even if the ACC was still viable, the ACC and its members could not enforce the fifty-foot setback restriction as to the Hunters' fence because either (1) the location of the fence was deemed approved by the ACC's failure to timely respond to the Hunters' proposal, or (2) the restriction was waived because the ACC allowed other property owners to have fences that violated the fifty-foot setback restriction.

A jury found in favor of the Hunters, and the trial court rendered judgment on the jury's verdict. In this appeal, Nolan and Loehman argue (1) the trial court erred in rendering judgment against the ACC, (2) the evidence was legally and factually insufficient to support the jury's finding that Nolan, as an individual property owner, waived his right to enforce the restrictive covenants, and (3) the trial court erred in rendering a money judgment against Loehman individually. We affirm.

## BACKGROUND

The restrictive covenants at issue in this case were recorded in the Comal County deed records on March 17, 1994.[1] These restrictive covenants provide that fences built on any lot in the subdivision must be approved by the ACC and must set back at least fifty feet from the roadway.[2]

---

[1]The restrictive covenants in question are titled: "Second Amended Restrictive Covenants for Emerald Valley Subdivision." There is some indication that the original restrictive covenants were created in 1979; however, the original restrictive covenants are not included in the record.

[2]The restriction stated in relevant part,

> No building, mobile home, fence or structure of any type shall be erected, placed or altered on any lot until the design and construction plans and specifications and a plat showing the location of the structure on said lot have been approved by the Architectural Control Committee as to the quality of workmanship and materials, harmony of external design with respect to topography and finish grade elevation. Under ordinary topographical circumstances, all residences, mobile homes and fences will be required to be set back 50 feet from roadways bordering the lot… .

The Hunters purchased their lot in the Emerald Valley Subdivision in February 2011. In April 2011, the Hunters hired a contractor to build a fence along the front of their lot. While the fence was under construction, Nolan approached the contractor and told him that the fence violated the subdivision's restrictive covenants, and that it needed to be removed by the following Monday or Nolan would file a lawsuit and obtain a temporary restraining order. Nolan also talked to the Hunters, advising them that he "[was] the [Architectural Control] Committee." Nolan gave the Hunters a business card, and told them they could submit a plan for their fence to the ACC at the address listed on the card. The Hunters stopped construction on the fence, and on May 11, 2011, submitted a plan in writing to the ACC. In the plan, the Hunters sought approval of a six-foot-high wood fence to be constructed along the front of their property. The fence was located 27.7 feet from the roadway bordering the Hunters' lot.

On May 21, 2011, Nolan, individually and on behalf of the ACC, sent a letter to the Hunters advising them that "the committee would be pleased to approve an attractive fence, such as a picket or wrought iron fence, up to four and one-half feet in height." The letter further stated, "A six foot high privacy fence is out of the question and will not be approved."

In June 2011, the Hunters filed the underlying lawsuit against the ACC and its three individual members, Nolan, Loehman, and Sharon Gallagher. The Hunters eventually nonsuited their claims against Gallagher. In the suit, the Hunters sought declaratory and injunctive relief. Nolan, Loehman, and the ACC answered the suit.[3]

In August 2012, the case was tried to a jury. The jury found that (1) the ACC had abandoned its function; (2) the ACC failed to timely disapprove of the Hunters' plan such that the Hunters'

---

[3]According to their fourth amended original answer, Nolan and Loehman answered the suit "individually and as representatives of the Emerald Valley Architectural Control Committee."

fence was deemed approved as to the location of the fence; (3) the ACC failed to appropriately take up, deliberate, and consider the Hunters' plan; (4) the ACC's response to the Hunters' plan was arbitrary, capricious, or discriminatory; and (5) the ACC, Nolan, and Loehman waived any right to enforce the restrictions as to the requirement that any fence must be at least fifty feet from the roadway. The trial court denied Nolan's and Loehman's motion for judgment notwithstanding the verdict, and rendered judgment on the jury's findings. This appeal ensued.

### THE JUDGMENT AND THE ACC

In issue two, Nolan and Loehman present multiple complaints about the judgment and the ACC. As a preliminary matter, the Hunters argue the ACC is not a party to this appeal because it failed to file a notice of appeal. The Hunters further argue that because the ACC did not appeal, we may not address Nolan's and Loehman's complaints about the judgment and the ACC. In response, Nolan and Loehman maintain that the ACC is a party to this appeal. They assert they appealed the judgment both in their individual capacities and in their representative capacities as members of the ACC.

"A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal." TEX. R. APP. P. 25.1(c). Furthermore, "[p]arties whose interests are aligned may file a joint notice of appeal." *Id*.

The record shows that Nolan and Loehman answered the Hunters' suit "individually and as representatives of the Emerald Valley Architectural Control Committee." Nothing in the record indicates that the Hunters challenged Nolan's and Loehman's authority to act as representatives of the ACC, or that the trial court found that Nolan and Loehman were unauthorized to act as representatives of the ACC. A single notice of appeal was filed. This notice of appeal states that Nolan and Loehman are appealing the trial court's judgment. When viewed as a whole, the record supports the conclusion that Nolan and Loehman are appealing the judgment in their individual

and representative capacities. We, therefore, address Nolan's and Loehman's issues regarding the ACC.

### 1. Election of Remedies Doctrine

Nolan and Loehman first argue the judgment against the ACC violates the election of remedies doctrine. "An election of remedies is the act of choosing between two or more inconsistent but coexistent modes of procedure and relief allowed by law on the same state of facts." *Custom Leasing, Inc., v. Tex. Bank & Trust Co.*, 491 S.W.2d 869, 871 (Tex. 1973). "When a party thus chooses to exercise one of them he abandons his right to exercise his other remedy and is precluded from resorting to it." *Id.* "The doctrine is designed to prevent a party who has obtained a specific form of remedy from obtaining a different and inconsistent remedy for the same wrong." *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 541 (Tex. 1987).

Here, Nolan and Loehman assert the judgment violates the election of remedies doctrine because it states both that the ACC abandoned its function and that the ACC acted in an arbitrary, capricious, and discriminatory manner. The Hunters presented alternative theories in this case, and the jury made findings based on these alternative theories. All of the jury's findings were incorporated into the judgment; however, the judgment does not provide the Hunters different and inconsistent remedies for the same wrong. Therefore, the judgment does not violate the election of remedies doctrine. *See id.*

### 2. Failure to Join Other Property Owners

Next, Nolan and Loehman complain of the Hunters' failure to join other Emerald Valley Subdivision property owners in their lawsuit. This issue, however, was never raised in the trial court. Because the issue was not raised in the trial court, it is not preserved for appellate review. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162-63 (Tex. 2004) (concluding a complaint about the absence of other property owners in a declaratory judgment action was waived when it

was not raised in the trial court); TEX. R. APP. P. 33.1 (providing that as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court).

### 3. Sufficiency of the Evidence to Support the Jury's Findings

The jury made four specific findings with respect to the ACC. Nolan and Loehman challenge the sufficiency of the evidence to support two of these findings. First, Nolan and Loehman challenge the legal sufficiency of the evidence supporting the finding that the ACC failed to act timely in response to the Hunters' proposal. Second, Nolan and Loehman challenge the legal and factual sufficiency of the evidence to support the jury's finding that the ACC acted in an arbitrary, capricious, or discriminatory manner as it related to requiring "an attractive fence, such as a picket or wrought iron fence, up to four and a half feet in height."

When reviewing a jury finding to determine the legal sufficiency evidence, we credit favorable evidence if a reasonable juror could and disregard contrary evidence unless a reasonable juror could not. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We sustain a legal sufficiency or no-evidence challenge only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

When reviewing a jury finding to determine the factual sufficiency of the evidence, we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When, as here, a party attacks the factual sufficiency of an adverse finding on which it did not have the burden of proof, we set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *See Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

First, Nolan and Loehman argue the evidence was legally insufficient to establish that the ACC failed to timely disapprove of the plans such that the Hunters' fence was deemed approved. The jury was asked: "As it relates to the location of the Hunters' fence as set forth in the Hunters' plans, do you find that the ACC failed to timely disapprove of those plans in writing such that the location of the Hunters' fence was 'deemed' approved pursuant to the last sentence of Paragraph 2 of the Restrictions?" The jury answered: "Yes."

The last sentence of Paragraph 2 of the Restrictions provided:

The Committee's approval or disapproval as required in these covenants shall be set out in writing and in the event the committee or its designated representative[] fails to approve or disapprove the plan within thirty (30) days after said plans and specifications have been submitted to it, approval will not be required and the related covenants shall be deemed to be fully complied with.

The evidence showed that on May 11, 2011, the Hunters submitted a plan for their fence to the ACC. In the plan, the Hunters proposed a six-foot high wood fence, located 27.7 feet from the roadway. On May 21, 2011, Nolan sent a letter to the Hunters advising them that "the committee would be pleased to approve an attractive fence, such as a picket or wrought iron fence, up to four and one-half feet in height." The letter further stated, "A six foot high privacy fence is out of the question and will not be approved." The letter, however, was silent as to the proposed location of the fence. Viewing the evidence in the light most favorable to the jury's finding, we

conclude the evidence was legally sufficient to support the jury's finding that the location of the Hunters' fence was deemed approved.

Second, Nolan and Loehman argue the evidence was legally and factually insufficient to establish that the ACC's response to the Hunters' plan was arbitrary, capricious, or discriminatory. The jury was asked: "Was the response to the Hunters' plans arbitrary, capricious, or discriminatory as it relates to requiring 'an attractive fence, such as a picket or wrought iron fence, up to four and [a] half feet in height?'" Again, the jury answered: "Yes."[4]

There was ample evidence from which the jury could conclude that the ACC's response to the Hunters' plan was arbitrary, capricious, or discriminatory. The evidence showed that the ACC consisted of three members: Nolan, Loehman, and Gallagher. Gallagher testified she never executed any kind of proxy, nor did she otherwise authorize Nolan to act on her behalf, with regard to her position on the ACC. According to Gallagher, she did not receive a copy of the plan submitted by the Hunters, nor did Nolan consult with her before he wrote the May 21, 2011 letter responding to the Hunters' plan. Nevertheless, the letter was printed on letterhead containing the names of all three ACC members. The letter stated, "I have reviewed the contents of your letter with other members of the committee, and we all agree that…the committee would be pleased to approve an attractive fence, such as a picket or wrought iron fence, up to four and one-half feet in height. A six foot high privacy fence is out of the question and will not be approved." The letter was signed by Nolan in his capacity as a member of the ACC. In addition, the letter expressly

---

[4]Section 202.004(a) of the Texas Property Code provides:

> An exercise of discretionary authority by a property owners' association or other representative designated by an owner of real property concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory.

TEX. PROP. CODE ANN. § 202.004(a) (West 2007).

rejected a "six foot high privacy fence," even though there were other fences in the subdivision measuring six feet or more in height. There was also evidence that at the time the letter was written, there were other wood, "privacy" fences similar to the fence proposed by the Hunters. We conclude the evidence was legally and factually sufficient to support the jury's finding that the ACC's response to the Hunters' plan was arbitrary, capricious, or discriminatory.

### 4. Improper Question for the Jury

Finally, Nolan and Loehman argue the jury's finding that the ACC failed to appropriately take up, deliberate, and consider the plans submitted by the Hunters was not a fact question for the jury but a legal question for the trial court. However, Nolan and Loehman cite no authority to support this argument in their brief. This argument is inadequately briefed and is therefore waived. *See* TEX. R. APP. P. 38.1(i)(stating an appellant's brief must contain appropriate citations to authorities); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing the "long-standing rule" that a point may be waived due to inadequate briefing).

### NOLAN AND THE JURY'S WAIVER FINDING

In issue one, Nolan argues that, even if the ACC abandoned its function, he had a separate right to enforce the restrictive covenants because he was a property owner in the subdivision. Nolan argues the evidence was legally and factually insufficient to support the jury's finding that Nolan, as an individual property owner, waived his right to enforce the restriction requiring fences to be at least fifty feet from the roadway, hereinafter referred to as "the restriction."

To establish waiver in a restrictive covenant case, the nonconforming property owner must prove that the then-existing violations are so great as to lead the mind of the average person to reasonably conclude that the restriction in question has been abandoned and its enforcement waived. *Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 935 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Jim Rutherford Inv., Inc.*, 25 S.W.3d 845, 851 (Tex. App.—Houston [14th

Dist.] 2000, pet. denied). Among the factors to be considered by the average person are the number, nature, and severity of the then-existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant. *Uptegraph*, 312 S.W.3d at 935; *Rutherford*, 25 S.W.3d at 851. Waiver is ordinarily a question of fact. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

Here, the jury was asked whether Nolan, Loehman, and the ACC waived any right to enforce the restriction requiring fences to be at least fifty feet from the roadway. The jury's answer to this question was "Yes." At trial, the jury heard testimony from numerous witnesses including Bill Hunter, Nolan, and several other subdivision property owners.

In his testimony, Bill Hunter listed twenty-one lots in the subdivision with fences located less than fifty feet from the roadway. Hunter further indicated this list was not comprehensive. Hunter took photographs of the noncomplying fences and measured the distances between the fences and the roadway. These photographs were admitted into evidence. Most of the noncomplying fences identified by Hunter were closer to the roadway than the Hunters' fence. In addition, some of the properties that had noncomplying fences were owned by Nolan or a company owned by Nolan. The lot next to the Hunters' lot was owned by King Lake Aviation, a company owned by Nolan. When the Hunters built their fence, this lot had a fence that was located less than twenty-five feet from the road. Nolan and another man removed the fence in December 2011, after the underlying lawsuit was filed. Another subdivision lot, occupied by Joe Pope, had a wood privacy fence located ten feet from the road. The evening before trial, Hunter watched Nolan and a couple of other men take down the noncomplying fence.

Donald Dwayne Moser testified that he had bought two lots in the subdivision two and a half years ago. Moser was in the process of building a house on one of these lots. When he started building his house, Moser was unaware of the restrictive covenants or the ACC. On October 28,

2011, Moser received a letter from the ACC, stating that his house violated the restrictive covenants. Moser talked to Nolan about the allegations in the letter and about the Hunters' lawsuit. During this conversation, Nolan admitted to Moser that there were "a bunch of violations" of the restrictive covenants in the neighborhood. Nolan told Moser he was "going to start taking people to court and getting everything straightened out."

Another subdivision property owner, Dottie Litchfield, testified her husband built a fence on her lot in 1999. Litchfield never sought approval of her fence from the ACC. Litchfield's fence was located less than fifty feet from the roadway. In 2002, Nolan was living on the lot across the street from Litchfield's lot. Litchfield recalled that she and Nolan had had a conversation while standing near the front of her lot. Nolan could clearly see Litchfield's noncomplying fence. But Nolan never mentioned to Litchfield that her fence violated the restriction, and Nolan never took any action regarding Litchfield's fence. In 2009, Litchfield removed the fence and replaced it with another fence. The new fence was in the same location. Again, Litchfield did not submit a plan to the ACC. It was not until December 2011, about six months after the Hunters filed the underlying lawsuit, that Litchfield received a letter from Nolan complaining about the location of her fence.

Charles Patty, who also lived in the subdivision, testified that he had built a fence on his property in 2008. Part of Patty's fence was located along the front of his lot about twenty feet from the road. No one had formally complained about the fence. However, an unidentified person had once driven by in a car and told Patty's father-in-law to move the fence because it was too close to the road. Patty was not exactly sure when this happened, but he thought it was some time in 2011 or 2012.

Robert Johannessen testified that in 2004 he had bought a lot from Nolan in the subdivision. Shortly after buying the property, he built a fence in the back yard. He did not submit a plan to the ACC prior to building the fence. After the fence was built, Nolan visited Johannessen's house.

According to Johannessen, Nolan had to have noticed the newly-constructed fence. However, Nolan never said anything to Johannessen about his failure to obtain the ACC's approval of the fence.

Finally, Nolan testified that he is a lawyer and he knows "quite a bit about developments." In fact, Nolan was the lawyer who drafted the Second Amended Restrictive Covenants for the Emerald Valley Subdivision. At the time of trial, Nolan owned "several [rental] properties" in the subdivision. Nolan admitted that his corporation, Canyon Lake Aviation, Inc., owned twenty lots in the subdivision in early 2012. By the time of trial, several of these lots had been sold. Nolan also acknowledged he was providing seller-financing on thirteen lots in the subdivision. Nolan said he retained an interest in these thirteen lots and it was possible that the lots would revert back to him in the future. Nolan estimated that over the last ten years he had had an interest in about seventy lots in the subdivision. Nolan admitted that he had never filed a lawsuit to enforce any of the restrictive covenants.

### 1. Violation Rate

In challenging the jury's finding, Nolan argues the evidence was insufficient to support the jury's finding as a matter of law based on the violation rate. The violation rate shows the number of properties subject to the restriction relative to the number of violations. Nolan maintains that the evidence showed a 6.8% violation rate in the subdivision. According to Nolan, a 6.8% violation rate is insufficient as a matter of law to support a finding of waiver under Texas law. We reject Nolan's argument for two reasons.

First, waiver is a fact-intensive inquiry involving multiple factors. *See Uptegraph*, 312 S.W.3d at 935; *Rutherford*, 25 S.W.3d at 851. "While the violation rate is an important and often compelling consideration, it is not the only factor in the analysis." *City of Houston v. Revels*, 2001 WL 699546, at *2 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (mem. op.) (not designated

for publication) (recognizing its prior decisions finding that violation rates ranging from 1.9% to 8.9% were insufficient to support a waiver of restrictions). Even the cases cited by Nolan in support of his argument show that courts analyze multiple factors when determining whether or not a party has waived the right to enforce a restrictive covenant. *See*, e.g., *Uptegraph*, 312 S.W.3d at 935-36; *Stephenson v. Perlitz*, 537 S.W.2d 287, 289-90 (Tex. Civ. App.—Beaumont 1976, writ ref'd n.r.e.).

Second, the evidence in this case did not establish a violation rate. Nolan relies on his own testimony to establish the total number of lots in the subdivision, and the Hunters' evidence to establish the total number of lots violating the restriction. Nolan testified there were "pretty close to 424 lots in the subdivision." According to Nolan, the Hunters' evidence established twenty-nine violations of the restriction. But Nolan mischaracterizes the evidence presented by the Hunters. The Hunters did not present evidence of the total number of lots in the subdivision violating the restriction. Rather, the Hunters presented evidence identifying some of the lots violating the restriction.

## 2. Knowing and Voluntary Relinquishment of Right to Enforce/Material and Substantial Effect

Next, Nolan argues there was "no evidence" that the other violations of the restriction materially affected him, or that he knowingly and voluntarily relinquished his right to enforce the restrictive covenants.

Generally, waiver can be asserted against a party who intentionally relinquishes a known right or engages in conduct inconsistent with claiming that right. *Tenneco Inc.*, 925 S.W.2d at 643. Waiver can be established by a party's express renunciation of a known right, or by his silence or inaction for so long a period as to show an intention to yield the known right. *Id.*

A property owner may waive his right to complain of a violation of a restriction by failing to object to other violations. *See Stewart v. Welsh*, 178 S.W.2d 506, 508 (Tex. 1944); *Garlington v. Boudreaux*, 921 S.W.2d 550, 553 (Tex. App.—Beaumont 1996, no writ). However, a property owner is not required to complain of a violation of a restriction if the violation is merely trivial or does not materially affect him. *Stewart*, 178 S.W.2d at 508; *Garlington*, 921 S.W.2d at 552-53. "'[A] violation of a restrictive covenant at a point on a tract distant from the lot of an individual lot owner may be of no interest whatever to such an owner, and cannot appropriately call for affirmative action on his part.'" *Spencer v. Maverick*, 146 S.W.2d 819, 824 (Tex. Civ. App.—San Antonio 1941, no writ) (quoting *Ward v. Prospect Manor Corp.*, 206 N.W. 856, 859 (Wis. 1926)). In evaluating waiver, courts distinguish between the rights of an individual property owner and the rights of a proprietor, such as a subdivider. *Garlington*, 921 S.W.2d at 553; *Spencer*, 146 S.W.2d at 824. This distinction arises from the fact that a "'proprietor is or may be directly interested in violations of such covenants upon any part of the entire tract, and acquiescence on his part may appropriately deny him the equitable right to enforce the covenants.'" *Spencer*, 146 S.W.2d at 824 (quoting *Ward*, 206 N.W. at 859).

Here, the evidence showed Nolan had ownership interests in many lots in the subdivision. Thus, Nolan was not a mere individual property owner. The evidence also showed that Nolan had owned lots in close proximity to lots that had fences violating the restriction. For example, Litchfield's fence violated the restriction for more than a decade. Nolan occupied a lot across the street from Litchfield. But Nolan never complained about Litchfield's fence. Litchfield then built a second fence that violated the restriction. Nolan did not complain about Litchfield's second fence until after the underlying lawsuit was filed. In addition, the evidence showed that Nolan's company owned two lots with fences that violated the restriction. One lot, a rental property, was next to the Hunters' lot. The fence on this property was not removed until December 2011, approximately six

months after the underlying lawsuit was filed. Furthermore, the evidence showed that Nolan admitted to another property owner, Moser, that there were "a bunch of violations of the restrictive covenants" in the subdivision. Nolan also indicated to Moser that he was going to have to start enforcing the restrictive covenants.

Based on this evidence, the jury could have reasonably concluded that Nolan was materially affected by other violations of the restriction, and that Nolan intentionally relinquished his right to enforce the restriction or engaged in conduct inconsistent with claiming that right.

### 3. Non-Waiver Provision

Nolan finally argues the evidence was insufficient to support the jury's waiver finding because of a purported nonwaiver provision in the restrictive covenants. Nolan does not expressly identify the purported nonwaiver provision in his brief; however, the record indicates Nolan is referring to Paragraph 12 in the restrictive covenants, which states: "An uncorrected violation of one of these restrictions by one or more lot owners in the subdivision shall not invalidate the restriction with respect to future violations of that restriction."

To support his argument, Nolan cites *Musgrove v. Westridge Street Partners I, LLC*, No. 2-07-281-CV, 2009 WL 976010 (Tex. App.—Fort Worth 2009, pet. denied). In *Musgrove*, the appellants argued the appellee's abandonment/waiver defense was precluded as a matter of law based on a nonwaiver provision in the restrictive covenants. *Id*. at *4. The Fort Worth Court of Appeals rejected this argument, citing cases holding that nonwaiver provisions, like other contractual provisions, can be waived. *Id*. (citing *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 676 (Tex. App.—Austin 2003, pet. denied); *Winslow v. Dillard Dep't Stores, Inc.*, 849 S.W.2d 862, 863-64 (Tex. App.—Texarkana 1993, writ denied)). The court recognized that at least one Texas court had held that "the existence of [a] nonwaiver provision raised a fact issue on waiver." *Id*. (citing *TX Far West, Ltd. v. Texas Inv. Mgmt., Inc.*, 127 S.W.3d 295, 306 (Tex. App.—Austin

2004, no pet.)). The court then agreed with the holding of an Arizona court that a nonwaiver provision would be ineffective if a complete abandonment of the restrictions had occurred. *Id*. (citing *Burke v. Voicestream Wireless Corp. II*, 87 P.3d 81 (Ariz. Ct. App. 2004)). To resolve the issue concerning the nonwaiver provision, the court reviewed the record for evidence of abandonment of the restrictive covenants. *Id*.

> In the present case, the jury was instructed:

> To establish waiver, the Hunters must prove that the violations of others in the Subdivision have been allowed and are so great as to lead the mind of the average person to reasonably conclude that the restriction in question has been abandoned. The time to consider waiver is when the party seeking to enforce the Restriction against the Hunters first asserted the applicability of the Restrictions and urged its removal in April, 2011. In determining whether a restrictive covenant has been waived, the factors that may be considered include the number, nature, and severity of the then-existing violation(s), any prior acts of enforcement of the restrictions, and whether it is still possible to realize to a substantial degree the benefits intended through the Restriction. *The last sentence of Paragraph 12 of the Restrictions is not determinative, as the focus of waiver is whether the Defendants allowed or tolerated other violations, and a non-waiver provision can itself be waived if there is evidence that violations of this Restriction are so pervasive that it subverts the general scheme or plan contemplated in the Restrictions.*

(emphasis added).

Here, the jury was instructed that the purported nonwaiver provision in this case was "not determinative" in part because "the focus of waiver is whether the Defendants allowed or tolerated other violations." Nothing in the record shows that Nolan objected to, or otherwise complained about, this jury instruction. As previously discussed, the jury's finding that Nolan waived his right to enforce the restriction was supported by sufficient evidence. Accordingly, we reject Nolan's argument that the evidence was somehow insufficient because of the purported nonwaiver provision in the restrictive covenants.

**THE JUDGMENT AND LOEHMAN**

The judgment provides that the Hunters "are entitled to recover of and from Defendants Edwin Nolan, Joel Loehman, and Emerald Valley Architectural Committee ("ACC"), jointly and severally, the sum of $30,000.00, which monetary judgment is for attorneys' fees as found by the jury." In issue three, Loehman argues the trial court erred in rendering a money judgment against him individually, in the absence of any "individualized, adverse" findings against him. However, Loehman cites no authority in support of this argument. Loehman's argument is inadequately briefed and is therefore waived. *See* TEX. R. APP. P. 38.1(i) (stating an appellant's brief must contain appropriate citations to authorities); *see also Fredonia*, 881 S.W.2d at 284 (discussing the "long-standing rule" that a point may be waived due to inadequate briefing).

**CONCLUSION**

We overrule all of the issues presented in this appeal, and affirm the trial court's judgment.

Karen Angelini, Justice